**TRANSTECH INDUSTRIES, INC., et al., Plaintiff,**

v.

**A & Z SEPTIC CLEAN, et al., Defendants.**

**Civ. A. No. 90–2578.**

United States District Court, D. New Jersey.

July 30, 1992.

---

Dante Romanini, Kozlov, Seaton & Romanini, P.C., Cherry Hill, N.J., for plaintiff.

Steven L. Lapidus, Robinson, St. John & Wayne, Newark, N.J., for A & Z Septic Clean.

Dennis J. Krumholz, Riker, Danzig, Scherer, Hyland & Peretti, Morristown, N.J., for Clairol.

Michael Lampert, Kraft & McManimon, Newark, N.J., for Aetna Chemical Corp.

## OPINION

HAROLD A. ACKERMAN, District Judge.

Plaintiffs in this action are owners and/or operators of a hazardous waste site. Having spent approximately $13 million to clean up the site, plaintiffs seek through this action contribution costs from the 440 users of the site. Over two-hundred of the 440 defendants had previously settled a claim for clean-up costs brought by the federal government. Accordingly, these defendants, citing a federal statutory provision, filed a motion to dismiss the complaint for a failure on the part of the plaintiffs to allege a set of facts upon which relief can be granted. The motion is opposed by plaintiffs and by the other, non-settling, defendants. Additionally, defendant Clairol (one of the settling defendants) moves to strike the plaintiffs' complaint, and, in the alternative, for summary judgment pursuant to Rule 56. I will address each motion separately.

## SETTLOR DEFENDANTS MOTION

### I. *Standard for Summary Judgment*

As an initial matter, Federal Rule of Civil Procedure 12(b) states that

If, on a motion asserting the defense ... to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

In their motion papers, defendants rely heavily on language of a consent decree they entered into with the United States government, a document that was not a part of the pleadings.[1] Thus, parties were notified that I am treating their motion as a Rule 56 motion for summary judgment. All parties were given an opportunity to submit additional relevant materials under Rule 56.

Construing this motion as one for summary judgment, I note that summary judgment may be granted only if the pleadings, supporting papers, affidavits, and admissions on file, when viewed with all inferences in favor of the nonmoving party, demonstrate that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. See *Todaro v. Bowman*, 872 F.2d 43, 46 (3rd Cir.1989); *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 896 (3rd Cir.), cert. dism'd, 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987). Put differently, "summary judgment may be granted if the movant shows that there exists no genuine issues of material fact that would permit a reasonable jury to find for the nonmoving party." *Miller v. Indiana Hospital*, 843 F.2d 139, 143 (3rd Cir.1988), cert. denied, 488 U.S. 870, 109 S.Ct. 178, 102 L.Ed.2d 147 (1988). An issue is "genuine" if a reasonable jury could possibly hold in the nonmovant's favor with regard to that issue. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). A fact is material if it influences the outcome under the governing law. Id. at 248, 106 S.Ct. at 2510.

Within the framework set out above, the moving party essentially bears two burdens: First, there is the burden of production, of making a prima facie showing that it is entitled to summary judgment. This may be done either by demonstrating there is no genuine issue of fact and that as a matter of law, the moving party must prevail or by demonstrating the nonmoving party has not shown facts relating to an essential element of the issue for which it bears the burden. Once either showing is made, this burden shifts to the nonmoving party who must demonstrate facts supporting each element for which it bears the burden as well as establish the existence of genuine issues of material fact. Second, there is the burden of persuasion. This burden is a stringent one which always remains with the moving party. If there remains any doubt as to whether a trial is necessary, summary judgment should not be granted. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 330–33, 106 S.Ct. 2548, 2556–58, 91 L.Ed.2d 265; *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157–61, 90 S.Ct. 1598, 1608–10, 26 L.Ed.2d 142 (1970); Advisory Committee's Notes on Fed.Rule of Civ.Pro. 56(e), 1963 Amendment; see generally C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2727 (2nd ed. 1983).

With this standard in mind, I turn to the facts surrounding this motion.

## II. *Background*

This case turns on an interpretation of the Comprehensive Environmental Response, Liability and Compensation Act (CERCLA), a complex piece of federal legislation passed in 1980, significantly amended in 1986, and designed to effectuate quick cleanups of hazardous waste sites. At issue here is a site known as Kin–Buc (the "Site"), which has been a trash disposal site in New Jersey since 1947. During 1968, the Site began operating as a state-approved landfill for hazardous waste dis-

---

1. The consent decree was approved in *United States v. Absolute Fire Protection Co., Inc.*, No. 88–207 (ALJ) (D.N.J. Aug. 1, 1988).)

posal, and continued as such until 1976, when the state of New Jersey revoked Kin–Buc's operating permit and enjoined any further hazardous waste disposal.

Following the Site's closure to hazardous waste, the Environmental Protection Agency ("EPA") began pursuing statutory remedies to make the Site safer and cleaner. Specifically, the EPA filed an action against the owners and operators of the Site (which included plaintiffs in the instant action), which was designed to force those responsible for the Site's situation to engage in clean-up operations. The action was settled on January 30, 1980, when the owner/operators (again, including plaintiffs) agreed to perform and bear the costs of a number of actions designed to limit pollution at the Site. Shortly thereafter, in 1980, the EPA determined that the pollution was still occurring, and instituted its own cleanup. It treated and disposed of leachate at a pool at the Site, and removed numerous toxic drums. At some point in the next two years, the EPA also prepared a Remedial Investigation and Feasibility Study ("RI/FS") to determine the nature and extent of hazardous substances at the site. When plaintiffs assumed the remedial activities pursuant to a 1982 agreement with the EPA, the EPA ceased its own clean-up operations.

In 1981, the rules governing such cleanups changed, and the EPA gained a new point of leverage: CERCLA. CERCLA allocated 1.6 billion for cleanups of hazardous waste sites for which no responsible party could be found. It also authorized the EPA to institute broad measures to force owners, users, or operators of sites to clean up their sites or reimburse the EPA for any of its unilateral actions in cleaning up sites. These owners/operators/users of

hazardous waste sites were referred to in CERCLA as "potentially responsible parties" ("PRPs").

In 1983, the EPA determined that the owners and operators of Kin–Buc were PRPs for the pollution, and hence were potentially liable to the EPA for EPA expenditures in its clean-up programs. On September 23, 1983, the EPA issued a unilateral administrative order pursuant to CERCLA Section 106 (the "106 Order") requiring all owners and operators of the Site, which included plaintiffs in this action, to continue the response actions they were performing since 1982, perform its own RI/FS, and operate, maintain and monitor systems to eliminate the release or threat of release of hazardous substances.[2] In May 1984, the owners and operators of the Site submitted proposed remediation plans to the EPA. The EPA selected a plan that included a variety of remedial actions for the owners and operators to undertake.[3]

In 1984, the EPA sought to collect restitution for its expenses at the Site. It wrote letters to about 360 PRPs, demanding reimbursement for $4,980,398. This amount constituted the EPA's expenses regarding: 1) the leaching costs at the pool between February, 1980 and October, 1982; 2) personnel, analytical and administrative costs; 3) engineering plans for effectuating the cessation of releases at the Site; and 4) preparation of its initial Remedial Investigation and Feasibility Study.[4]

Shortly after the EPA instituted the action for response costs, a number of operators began negotiating a settlement with the EPA. Eventually, in the summer of 1988, 226 defendants joined in the settlement, agreeing to pay the EPA a total of $4.9 million. Though they were given notice of the settlement, as was required by

2. In March, 1986, the EPA issued another 106 Order, incorporating all the measures of the previous order and setting a deadline for completion by Plaintiffs of certain response actions.

3. These actions included: installing a slurry wall to bedrock around the Landfill; installing and maintaining landfill capping; collecting and treating leachate; and operating, maintain-

ing and monitoring the remedial measures implemented at the Site.

4. These costs involved not only the actual costs expended by the EPA in its own actions cleaning up the Site, but also its expenses in determining what remedial actions would be appropriate for plaintiff to undertake.

statute [5], plaintiffs did not join in the settlement agreement.

On August 16, 1990, plaintiffs brought this CERCLA action against 441 users and operators of the Site, to recoup their share of the expenses. This action flows out of the work plaintiffs have undertaken pursuant to the EPA's 106 Order. Plaintiffs estimate their costs to date for the work they had undertaken pursuant to the EPA's Order to be $13 million, and that future remedial work will exceed $100 million.[6] The settler-defendants [7], relying on a different provision of CERCLA, contend that the consent decree they entered into with the EPA absolved them of all liability to any other PRP connected with the Site for disposal of hazardous wastes at the Site. They thus make this motion for dismissal. I will now turn to a discussion of these issues.

### III. Discussion

#### A. CERCLA

In 1980, Congress became convinced that deposits of hazardous substances and wastes at various dump sites throughout the country posed serious problems to public health and necessitated prompt clean-up operations. See, e.g., Dedham Water Co. v. Cumberland Farms Dairy, Inc., 805 F.2d 1074, 1081 (1st Cir.1986). In response, it enacted an exceedingly complex piece of legislation called the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq., which authorized funds for an enormous clean-up program and presented statutory authority to hold operators of and contributors to hazardous waste sites strictly liable for the clean-up costs of remedying the situation. 42 U.S.C. § 9607. Under the statute, persons who owned or operated a hazardous waste facility, disposed hazardous substances at such facility, arranged for disposal at a facility, or who accepted hazardous substances for transport to disposal or treatment facilities could be held liable for "all costs of removal or remedial action incurred by the United States Government or a State ... [and for] any other necessary costs of response incurred by any other person consistent with the national contingency plan." Id.

Once a site was identified as necessitating immediate cleanup, the statute explicitly provided the EPA with several remedies. It could issue an administrative order directing the responsible parties to implement response actions. 42 U.S.C. § 9606. It could apply to a district court for an injunction to compel responsible parties to abate releases of hazardous substances from the site. Finally, it could undertake remedial action itself, using funds from the Superfund provided by the statute, and then sue the responsible parties for reimbursement. 42 U.S.C. §§ 9604, 9607. See, e.g., United States v. Rohm & Haas Co., 669 F.Supp. 672, 674 (D.N.J.1987). Section 107 confined defenses to liability to those enumerated in Section 107(b) [8].

---

**5.** In this decision approving the consent decree, Judge Lechner specifically noted that the United States had complied with the required statutory notice provisions. Judge Lechner further declined to allow some parties, who had missed statutory deadlines for joining the settlement, to join late. See United States v. AFP Co., Inc., No. 88–2087, transcript op. at 4 (D.N.J.1990). The non-settling defendants challenge the constitutionality of the notice given them, claiming that one publication in the Federal Register is insufficient. For the reasons detailed in this opinion, I do not need to reach this question.

**6.** These figures were supplied by plaintiff in response to this Court's request for supporting materials pursuant to Rule 12(b).

**7.** The settler defendant group consists of over 200 of the defendants.

**8.** Section 107(b) lists only the following defenses:
"(1) an act of God;
"(2) an act of war;
"(3) an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant (except where the sole contractual arrangement arises from a published tariff and acceptance for carriage by a common carrier by rail), if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the conse-

While CERCLA provided the EPA with clear authority to sue owners of and contributors to hazardous waste sites, the ability of those sued by the EPA to seek contribution costs from other potentially responsible contributors was in doubt. This was true despite the fact that Section 107 provided that PRPs can be liable to private parties that engage in clean-up operations. See, e.g. *Burlington Northern R. Co. v. Time Oil Co.*, 738 F.Supp. 1339 (W.D.Wash.1990); see also *United States v. New Castle County*, 642 F.Supp. 1258, 1263 (D.Del.1986) (noting that other statutes expressly created rights to contribution, but CERCLA did not). But by 1986, Congress realized that if cleanups are going to be effectuated quickly, it not only had to provide incentives for settlements with the government but also had to assure that liable parties could seek restitution from other potentially liable parties. Accordingly, Congress adopted a series of amendments to CERCLA, designed to further these two policy objectives. The first CERCLA amendment stated that "any person may seek contribution from any other person who is liable or potentially liable under section 107(a)...." 42 U.S.C. § 9613(f)(1). Allocation of costs are to be governed by "such equitable factors as the court determines are appropriate." 42 U.S.C. § 9613(f)(1). By adding this provision, Congress clarified its intent to have the costs of hazardous waste cleanups shared by all responsible parties. The second provision provides that parties who have "resolved [their] liability to the United States ... in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement." 42 U.S.C. § 9613(f)(2). The purpose here is to encourage parties to settle with the government, which, in turn, served to quickly effectuate urgent clean-up operations.

Plaintiffs argue that they have a right to response costs under Section 107(b), or, alternatively, to contribution costs under Section 113(f)(1). Defendants, through this motion, contend that such claims are barred by 113(f)(2) because their settlement with the government encompassed all liability arising out of hazardous waste disposal at the Site.

### B. Section 107(a)

█ While plaintiffs allege causes of action under both Section 107(a) and Section 107(b), in response to defendants' motion, plaintiffs initially contend that this suit is brought under Section 107(a) and, therefore, the available defenses are strictly limited as a matter of law to those enumerated in Section 107(b). Section 107(a) of CERCLA states that any owners and users of hazardous waste sites are liable for "any other necessary costs of response incurred by any ... person consistent with the national contingency plan; ..." 42 U.S.C. § 9607(a)(4)(B). Section 107 further states that liability is "subject only to the defenses set forth in subsection (b) of this section." [9] Thus, plaintiffs contend that since the defendants' grounds for their motion are articulated in section 113(f)(2) rather than in section 107(b), the motion must fail as a matter of basic statutory interpretation.

More specifically, plaintiffs argue that the statutory scheme divides causes of action between privately initiated cleanups and cleanups initiated under threat by the EPA. Under plaintiffs' theory, claims of the former type constitute claims for response costs under § 107, while claims of the latter type are contribution claims under § 113(f)(1). Unlike response cost claims, Section 113(f)(1) contemplated ordinary tort principles of contribution, which require a finding of joint and several liability. Section 107(a), on the other hand, is purely a statutory-created, cost-recovery remedy, with limited defenses. Plaintiffs then contend that since they voluntarily began their clean-up operation, theirs is a cost recovery action under Section 107.

quences that could foreseeably result from such acts or omissions; or

"(4) any combination of the foregoing paragraphs."

**9.** The defenses under section (b) are: acts of God, acts of war, or unforeseeable acts or omissions of third parties.

See also *Key Tronic Corp. v. United States*, No. C–89–694–JLQ, slip op. at 15 (E.D.Wa. Aug. 9, 1990) (CERCLA does not bar actions "to recover *privately* incurred initial response costs from a settlor PRP who has obtained contribution protection from the EPA for the final clean-up costs.")

I disagree. Prior to the 1986 amendments to CERCLA, "it was unclear whether a private right of action existed for contribution to defendants from other potentially liable parties." *Burlington Northern R. Co. v. Time Oil. Co.*, 738 F.Supp. 1339, 1341 (W.D.Wash.1990). Congress enacted section 113(f)(1), which provides that "[a]ny person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title," see 42 U.S.C. § 9613(f)(1), to provide for fairness in situations where one party was bearing the cost of a major hazardous waste site simply because the EPA targeted it first. The clear import of this language is to allow persons situated like plaintiffs in this case to gain reimbursement for their clean-up expenditures from other PRPs—the point of Section 113(f)(1) is to share the costs among the blameworthy parties. Without this statutory language—which plaintiffs seem to write away with their argument—it is unclear whether they would have a CERCLA cause of action at all.

■ Further, plaintiffs' argument in this regard defies the meaning of "contribution." Plaintiffs contend that since there never was a judgment issued against them,

there was never legal liability to seek contribution for, and therefore its claim is not a claim for contribution. Under general legal principles, a claim for contribution is one in which one liable party attempts to recover from another potentially liable party for its share of the cost. See, e.g. *Northwest Airlines, Inc. v. Transport Workers Union of America*, 451 U.S. 77, 87–88, 101 S.Ct. 1571, 1578–79, 67 L.Ed.2d 750 (1981); *In Re Agent Orange Product Liability Litigation*, 818 F.2d 201, 207 (2nd Cir.1987). Absent a statutory provision to the contrary, a claim against one liable party by a party who voluntary agreed to perform certain actions pursuant to a settlement agreement is still a claim for contribution.[10] Plaintiffs present no reason why this flexible understanding of contribution should be any different under CERCLA. *Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 672 (5th Cir.1989) (when one liable party sues another PRP for its share of response costs incurred by the former, the claim is one of contribution.) In other words, plaintiff's 107(a) action against defendants is authorized by section 113(f)(1)'s contribution provisions, for precisely the reasons that plaintiffs articulate the need for this action. In fact, when properly construed, the two sections work together, one governing liability and the other governing contribution from those found liable. First, the plaintiff must show that the defendant has incurred section 107(a) liability. Then, it can sue for contribution under section 113(f)(1). *Amoco Oil*, 889 F.2d at 672.

■ Moreover, even if I accepted plaintiff's distinction between response costs and contribution costs, I find that plaintiffs

10. In *Huggins v. Graves*, 337 F.2d 486 (6th Cir. 1964), the Court of Appeals stated the reasons for this broad view of contribution:

"[T]he principle of contribution is founded ... upon the principles of equity and natural justice, which require that those who are under a common obligation or burden shall bear it in equal proportions and one party shall not be subject to bear more than his just share to the advantage of his coobligor.... [W]hile a judgment is conclusive on this issue it is not necessary that it be proved in that way. If a judgment has not been rendered, the validity

of the claim against both of the parties can be determined by the Court in the action seeking contribution."
Id. at 489. Ironically, the argument that a claim is not one for contribution in the absence of a legal judgment ordinarily is made by the defendants, who claim that they took no part in the settlement and may have opposed it yet still have to share it. See Prosser and Keeton on the Law of Torts at 339 (Lawyer's Ed.1984). Here, the defendants not only are not making this argument, they are emphatically contending that plaintiff's claim is one for contribution.

are being facetious at best in their argument that it acted voluntarily, privately, and in keeping with the goals of CERCLA, and not as a result of government threats. Their argument, if accepted, would drain the words "voluntary" and "contribution" of any meaning whatsoever. In 1983, the EPA issued a unilateral administrative order pursuant to CERCLA section 106 directing plaintiffs and others to continue remedial measures to clean up the Site and ordering them to design, implement, maintain and monitor for thirty years the final long-term remedial action selected by the EPA for the landfill. These actions by plaintiff clearly are the result of civil actions by the government. If plaintiff failed to comply with the agreements it made with the government, they would be directly liable in the form of civil fines or additional injunctive orders. Action under such threats is hardly "voluntary." (Contrast with *Key Tronic*, slip op. at 2 ("Key Tronic alleges that it incurred, *at its own initiative*, expenses totaling $1.271,511.10....") (emphasis added.))

█ Even if I was, however, to treat plaintiff's suit against defendants as purely a section 107 action, and even if I accepted their claim that they acted voluntary, the Third Circuit has explicitly rejected the argument that the defenses enumerated in section 107(b) are exclusive. *Smith Land & Imp. Corp. v. Celotex Corp.*, 851 F.2d 86, 89 (3rd Cir.1988). In *Smith Land*, a present owner of a landfill sued a former owner for contribution. The Third Circuit recognized that section 107 is inexorably linked with section 113, and hence found that the defenses enumerated in section 107(b) are not exclusive, but extend to include § 113(f)(2). The holding is not only controlling; it is persuasive—CERCLA, including the original statute and the amendments, must be read in its entirety, as a single Congressional response to the problem of hazardous waste and a program for remedying the current situation. A section 107 claim by a party liable to the government for contribution from other PRPs can only be understood in light of all the relevant statutory provisions.

Thus, plaintiff fails in its argument that since its claim is authorized by Section 107, it is not subject to a Section 113(f)(2) defense,

This by no means ends the inquiry; rather it changes the focus to whether section 113(f)(2) merits dismissal of the claims against the settler-defendants. And defendants next claim that section 113(f)(2) provides immunity from liability for all matters covered by the consent decree.

## C. Section 113(f)(2)

Defendants argue that they have an absolute defense to plaintiffs' claim for contribution, under 113(f)(2). Section 113(f)(2) states that a "person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement." 42 U.S.C. § 9613(f)(2). By its very language, Congress enunciated a strong desire for settlements as the best means to effectuate the goals of CERCLA, concluding that immunity from contribution liability would be the proverbial "carrot" to coax parties into settling. See, e.g., *United States v. Rohm & Haas*, 721 F.Supp. 666, 677 (D.N.J.1989) ("By enacting section 113(f)(2) ... Congress has plainly indicated that non-settling defendants' contribution claims will be barred."); *Smith Land*, 851 F.2d 86, 89 (section 113(f)(2) absolves settling parties from claims of contribution.) Defendants argue that a primary policy behind the 1986 amendments to CERCLA was to encourage settlements by forcing non-settling parties to risk bearing an inequitable share for the cost of cleanup as a consequence of their unwillingness to settle with the government. Accordingly, they contend that to encourage them to settle, the EPA granted them the "carrot" of absolution from any further responsibility to clean up the Site. Plaintiffs, though, they contend, are paying for their unwillingness to join the settling defendants.

To evaluate the defendants' motion to dismiss, I must evaluate the terms of the

consent decree itself.[11]  If a material fact about the scope of the consent decree is in dispute, the motion must be denied.  *Todaro v. Bowman,* 872 F.2d 43, 46 (3d Cir. 1989).

The Consent Decree states its purpose to be "the recovery of all response costs that have been incurred by the United States in response to alleged releases and threatened releases of hazardous substances from the Kin–Buc Landfill."  Consent Decree at 8. In return for the settling parties agreement to pay the past response costs, the Decree provided that:

> the United States is agreeable to their so doing in full satisfaction of all claims of the United States with regard to Past Response Costs and Past Response Actions [and] to covenant to limit civil suit and administrative process against the Settling Parties for any Future Response Actions and any Future Response Costs which may be incurred by the United States in connection with the Kin–Buc Landfill

Con.Dec. at 12–13.  Particularly, the document worked to

> extinguish the United States' claims for Past Response Costs and Past Response Actions and shall be full and complete satisfaction of the Settling Parties' liabilities under CERCLA, or under any other statute or common law, with respect to Past Response Costs and Past Response Actions and for any administrative costs and civil penalties which may have accrued prior to April 30, 1987, and for interest on such sums which may have accrued prior to September 22, 1987, with regard to the Kin–Buc Landfill.

Con.Dec. at 16.  Defendants point out that the aforementioned language is extremely broad.  Therefore, they argue, it extends beyond the bounds of the government's suit and absolves them of other response costs.  Yet this language must be read in light of the action taken by the United States, the complex situation of this case, the policies behind CERCLA, and, most importantly, the matters the decree settles. In light of these factors, the defendants'

claim is untenable, for defendants' argument conflicts with the language of the consent decree itself, the reasonable expectations of the parties entering into the consent decree, the interpretation of the consent decree by the judge who authorized it, and the policies behind the relevant federal statutes.

### 1. *Language of and expectations of agreement*

▬ First, the agreement states that "the United States intends and expects that the Kin–Buc 106 Orders shall remain in full force and effect against the Owners/Operators and that said Orders shall result in the abatement of release and threat of release into the environment of hazardous substances at the Kin–Buc Landfill."  In other words, the agreement itself acknowledges the separateness of the prior arrangements with plaintiffs.  If defendants' arguments were correct, the government could not reasonably expect those agreements to remain in force, since the plaintiffs, who were the parties to that agreement, could have joined the consent decree and thereby extinguished those agreements.  (See supra.)

Second, the agreement clearly states that it covers "incurrence of costs through April, 30 1987, and interest on such costs through September 22, 1987, by the United States totalling $4,980,398."  It is in regard to these actual costs, incurred by the United States, that the United States agreed to find the settling defendants "in full satisfaction of all claims of the United States."  The consent decree thus covers the actual costs of $4.9 million and absolves defendants of liability for other remedial costs determined by the United States to have arisen from the relevant time period.

Third, the "covenant to limit civil suit and administrative process against the Settling Parties for any Future Response Actions and any Future Response Costs which may be incurred by the United States in connection with the Kin–Buc Landfill ..." only means that "the United States shall

---

**11.**  See *Allied Corp. v. Frola,* 730 F.Supp. 626, 638 (1990) (Section 113(f)(2) provides immunity

from suits for contribution regarding all matters addressed in the consent decree.)

not take such action against the settling parties until after having made all reasonable efforts to compel non-settling PRPs to implement future response actions." *AFP Co., Inc.* at 6. In no way was the government absolving defendants from all liability to any other party for the ongoing problems at the Site.

In light of these facts, it would be unreasonable for defendants, who are responsible for a large percentage of the problems at the Site, to have expected the agreement to completely absolve them of a problem that is far from over.

### 2. *Judge Lechner's opinion*

■ Further, defendants' interpretation of the consent decree is at odds with statements of the judge who approved the decree. In that opinion, Judge Lechner noted that "[t]he settling parties' agreement to pay the United States almost five million dollars implements the underlying cost recovery scheme of CERCLA by replenishing the Superfund promptly." *AFP Co., Inc.* at 9. This can only be interpreted to mean the consent decree covers the expenditures at the Site incurred by the EPA. Moreover, in response to a concern by a non-settling party, Judge Lechner held that "as long as [a non-settling party] complies with its legal obligations ... [it] may seek contributions from the settling parties." *Id.* at 17. A judge approving a consent decree in a CERCLA case is mandated to take into account the equities of the situation. He or she cannot approve a consent decree that is simply unjust or unfair. Given Judge Lechner's own equitable interpretation of the decree he approved, it would be illogical for this court to hold that as a matter of law, a contrary, inequitable interpretation, governs.

### 3. *Policies of CERCLA*

■ Finally, defendants' argument that a broad reading of the consent decree best comports with the policies behind CERCLA and its accompanying amendments is simply wrong. Defendants argue that since CERCLA contemplates punishing responsible parties for refusing to settle with the government, reading the consent decree to absolve defendant from any other contribution costs for cleaning up the Site accomplishes this. To take the defendants' arguments to their logical conclusion, let us imagine the result if the plaintiffs *had* agreed to settle:

In this case, the government's claim is for past response costs totalling $4.9 million, for the money it spent cleaning up the Site. This occurred alongside agreements between the EPA and plaintiffs for the plaintiffs to spend their own money to engage in various other clean-up activities, at past and future costs totalling over $30 million. According to defendants' argument, if plaintiffs joined the consent decree and settled the claims, then as a matter of law, the plaintiffs would be free of the requirements of prior agreements they had entered into for engaging in remedial actions to clean up the Site. In other words, by agreeing to pay a portion of $4.9 million to the government, the plaintiffs would have been able to extinguish their responsibility to engage in clean-up activities costing over $100 million. Such a result is at odds with the policies behind CERCLA of making the responsible parties pay for the clean up of hazardous waste sites. Settlement payments of $4.9 million for clean-up costs exceeding $100 million would do little to further the goal of allocating responsibility among parties who were in fact responsible, and of allocating responsibility equitably and proportional to the amount of harm done by each party. Such an agreement would not meet Congress's goal of expediting "effective remedial action and minimiz[ing] litigation." 42 U.S.C. § 9622(a); *United States v. Rohm & Haas*, 721 F.Supp. 666, 677 (D.N.J.1989). Moreover, to interpret the agreement to absolve defendants of responsibility for additional clean-up actions costing ten times more than that amount, defies the goal of encouraging parties to unilaterally engage in clean-up operations. As one court has noted, "[i]f fair apportionment of the expense is not assured, it is unlikely that one party will undertake remedial action promptly when it could simply delay, awaiting a legal ruling on the contribution liability of other

responsible parties." *Smith Land,* 851 F.2d 86, 90.[12]

■ Defendants correctly point out that one of the risks that non-settling parties take is the possibility of winding up shouldering a disproportionate share of the clean-up costs. See, e.g., *In re Acushnet River & New Bedford Harbor,* 712 F.Supp. 1019, 1027 (D.Mass.1989). But this is only with respect to the claims specifically addressed in the consent decree, not to every possible claim arising out of the same site. In other words, Section 113(f)(2) prevents parties from having to pay twice for the same cleanups. Thus, defendant is immune from further liability for the response costs incurred by the United States during the time period covered by the consent decree; defendants are not to pay twice for these response costs, even if the government later determines that it underreported those actual costs. Paying twice for the claim sued upon would in essence penalize the defendants for settling and reward the plaintiff for holding out. This would directly violate the policies behind the amendments to CERCLA. But in this case, defendants, even if they lose, paid only once for the costs incurred by the EPA.

This holding in no way inhibits Congress's policy of encouraging settlements—there is still strong incentive for settling for a much lesser amount than what the government is suing for. Thus, in the instant case, if defendants settled for $1 million, even though the suit was for $5 million, and even if they actually were responsible for a much greater share of the damage, plaintiffs could not gain contribution for any other portion of the $5 million. Their unwillingness to settle would have cost them that loss. Such are the situations in the cases defendants rely upon. It is not the situation in this case.

The defendants' motion for summary judgment must therefore fail because as a matter of law, the consent decree entered into by defendants only covers the past response costs and past response actions incurred by the United States. The problems at Kin–Buc are enormous and expensive, and defendants cannot escape responsibility for a potential $100 million by settling with the government for $4.9 million.

## DEFENDANT CLAIROL'S MOTION

■ In a related action, defendant Clairol moves to strike the plaintiff's claims against it [13] for the following reasons: 1) plaintiffs' amended complaint violates Rule 8(e) by failing to be clear and concise; 2) plaintiffs did not comply with specific nexus information requested by Magistrate Chesler, by Order of December 19, 1990, thus warranting a dismissal of plaintiff's pleading pursuant to Rule 16(f); 3) plaintiffs' pleading violates Rule 11 because they have no objective good faith basis to believe Clairol is liable. Alternatively, Clairol moves for summary judgment under rule 56(b). I will now turn to each of its arguments.

---

12. In support of their argument, though, defendants rely on *U.S. v. Rohm & Haas Co.,* 721 F.Supp. 666 (D.N.J.1989) and *United States v. Bell Petroleum Services, Inc.,* 1990 WL 310512, 1990 U.S. Dist. Lexis 14066 (W.D.T.1990). In *Rohm & Haas,* the defendants settled claims for actual EPA expenditures, which plaintiffs argued prevented them from obtaining contribution for those very expenditures and thereby violated equitable principles because the proportion of costs shared was inequitable. Specifically, EPA had expended approximately $65,-270,000 in its clean-up efforts. Id. at 671. The government entered into a consent decree with ten de minimis defendants (defendants who were each responsible for less than 1% of the damage to the site) and found them liable in total for $3,034,807. Id. 721 F.Supp. at 672. The case only held that those defendants could

not subsequently be held liable for any additional proportion of the $65,270,000—they were immune from any additional contribution liability.

In *Bell Petroleum,* the court approved a consent decree absolving the settling parties for contribution liability. However, the court was primarily moved by the fact that settling defendants were on the verge of bankruptcy, and that if the court did not approve the consent decree "it is unlikely the Government would receive any amount of money from [defendants] Bell or Regal in the end." *Bell Petroleum* at 5.

13. The relevant portion of plaintiffs' amended complaint reads: "The defendants named are each PRPs as generators and/or transporters and/or haulers of various chemical substances, including hazardous substances, to the Kin–Buc Landfill Site...."

## I. Rule 8(e)

First, defendants claim that plaintiff's complaint violates Rule 8(e), which reads that "[e]ach averment of a pleading shall be simple, concise, and direct." Fed. R.Civ.P. 7. Defendants rely on *Gordon v. Green*, 602 F.2d 743 (5th Cir.1979), and *Martin v. Hunt*, 29 F.R.D. 14 (D.Ma.1961) for their contention that the complaint must be stricken.

Defendants ignore a wealth of case law, including the principles articulated in the cases they rely on, interpreting Rule 8 very liberally. Rule 8 is intended to "eliminate prolixity in pleading and to achieve brevity, simplicity, and clarity." 602 F.2d at 746 (citing *Knox v. First Security Bank of Utah*, 196 F.2d 112, 117 (10th Cir.1952), in other words, to ensure that complaints are understandable, fair and amenable to response. Only complaints that clearly violate this standard should be stricken. In *Gordon* itself, the violative complaint was so garbled, wordy and confused that Chief Judge Brown titled the first section of his opinion "The Pleadings: Gobbledygook." 602 F.2d at 744. The various complaints and amendments totalled over 4,000 pages, contained sentences running full legal pages, and was, as the Court put it, "verbose and scandalous." Id. at 745. Judge Brown was quick to point out, though, that "we do not recede even one inch from the position expressed by this Court ... and a host of other cases sounding an approach of liberality...." Id. at 746. Similarly, the court in *Martin v. Hunt*, 29 F.R.D. 14 (D.Mass.1961), also relied on by defendants, described the complaint as containing "scandalous and vituperative" material. In other words, the case law consistently holds that in order to warrant dismissal of a case as a violation of Rule 8(e), the complaint must reach a level of outrageousness that far exceeds what is alleged here. While arguably lacking in detail, the complaint is clear and concise enough for defendants to understand the nature of the complaint and be able to respond and defend itself.

## II. Rule 16(f)

Next, defendants argue that plaintiffs violated Magistrate Chesler's Case Management Order No. 1 of December 19, 1990. The Order demanded that plaintiffs to provide:

a good faith effort, by way of preliminary presentation, without obligation to perform definitive or exhaustive review of material, and without prejudice, a detailed description of the hazardous substance(s) ... which such defendant allegedly transported or generated to the Kin–Buc Landfill site.

Rule 16(f) states that "if a party ... fails to obey a scheduling or pretrial order ... the judge, upon motion ... may make such orders with regard thereto as are just...." Cases that have been dismissed for violating this Rule universally have involved complete disregard of Court Orders. For example, in *Goforth v. Owens*, 766 F.2d 1533 (1985), relied on by defendants, the plaintiff did not submit to the court a medical statement that he was ordered to submit. Id. at 1534. As the court said, "the [district] court could have used the sanction of dismissal to punish counsel for his disregard of the court's orders to submit [the statement.]" Id. at 1535. See also *Titus v. Mercedes Benz of North America*, 96 F.R.D. 404, 405 (1982) (dismissing complaint for willful violation of court order); *Lockhart v. Patel*, 115 F.R.D. 44 (E.D.Ky. 1987) (striking pleadings of the defendant for "deliberately [refusing] to obey the order of the court").

In this case, the plaintiffs responded point by point to the Nexus order, alleging that Clairol was "(i) a generator; who (ii) supplied Waste Water, Processed Water Waste, Ink and Dye Waste, and Water Wash & Detergent...." By clear implication, plaintiffs are alleging that Waste Water, Processed Waste Water, Ink and Dye Waste, and Water Wash and Detergent are hazardous substances. At this point in the case, when the same Case Management Order limited the ability of plaintiffs to discover defendants' records, it is not unreasonable to respond as did plaintiffs. They did not flagrantly violate or ignore

the order; they cannot be held liable "for conduct which unreasonably delays or otherwise interferes with the expeditious management of trial preparation." Id. at 1535. See also *In re Baker,* 744 F.2d 1438, 1441 (10th Cir.1984).

## III. *Rule 11*

■ Next, defendant contends that the pleading violates Rule 11's good faith requirement. Under Rule 11, an attorney must certify "that to the best of his knowledge, information and belief formed after reasonable inquiry, the claim is well grounded ... in fact and in law." The test is reasonableness: By signing the complaint, attorneys for plaintiff are stating their belief that the complaint is grounded in fact and warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for an improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation." F.R.Civ.P. 11. Defendant simply has not presented evidence that plaintiff's allegations violate this standard. Plaintiffs' relied upon the following facts: 1) Clairol settled a claim by the EPA for contribution for government clean-up expenditures at the Site [14]; 2) the wastes alleged by plaintiffs to be hazardous were in fact deposited at the Site. While defendants contend that the claim it settled with the EPA was simply a payment of "nuisance money," that contention is simply not enough to show a violation of Rule 11.

## IV. *Summary Judgment Motion*

■ In the alternative, defendants move for summary judgment, under Rule 56(b). I have outlined the standard for summary judgment above. Clairol has not met its burden of showing that there is no issue of material fact in dispute.

In this case, Clairol essentially claims that it has not deposited hazardous waste products at the Site and that there is no

evidence on the plaintiff's part to contest this. It points out that in several past cases, Clairol has been accused and subsequently acquitted of disposing hazardous waste at sites, and that the same waste products are at issue here. But even relying solely on Clairol's own accompanying affidavits, material issues of fact remain as to whether Clairol has deposited hazardous waste products at the Site. Exhibit B of an affidavit by Mohamed H. Tarifi, a Clairol employee, lists a series of compounds that "May be Present in Clairol Concentrate Waste." Among these are "ammonia" and "Ethyl, Lauryl, & Other Ethers." As plaintiffs correctly point out, both of these are listed by the E.P.A. as hazardous substances under CERCLA. 40 C.F.R. § 302.4. In its reply brief, Clairol dismissively states that "as any simple textbook analysis would disclose, ammonia very rapidly becomes neutralized and turns into a harmless salt." The claim is that ammonia cannot "possibly generate response costs," but the fact is that the EPA has listed ammonia as a hazardous substance.[15]

Even if this contention about ammonia was persuasive, Clairol's argument about ethyl ether is clearly disingenuous. It contends that the item "Ethyl ... and Other Ethers" in Appendix B refers only to the chemical prefix "ether" and not to Ethyl Ether, the compound contained in the EPA's list. Yet the only reasonable interpretation of the language "Ethyl, Lauryl, & Other Ethers" is that the items referred to are Ethyl Ether, Lauryl Ether and Other Ethers. In another affidavit, Clairol nonetheless claims that its products contain no ethyl ether, but the contradictory statements in its supporting materials create enough questions to deny a motion for summary judgment. The opposing party to a motion for summary judgment bears the burden of responding *"only after* the moving party has met its burden of coming forward with proof of the absence of any genuine issues of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 321, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)

---

**14.** Clairol claims this settlement was a nuisance money; at this stage, this is by no means self-evident.

**15.** See *U.S. v. Alcan Corp.,* 964 F.2d 252, 260 (3rd Cir.1992) (To be hazardous under CERCLA, "the substance under consideration must simply fall within one of the designated categories.").

(quoting *Catrett v. Johns–Manville Sales Corp.*, 756 F.2d 181, 183, n. 3 (D.C.Cir. 1985). Defendants have not met this burden.

Moreover, summary judgment generally should not be granted before an opportunity for discovery. See, e.g. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In a complex case such as this, in which much of the evidentiary material is in the depositors hands, discovery is all the more imperative. See, e.g., *United States v. Price*, 577 F.Supp. 1103, 1115 (1983) ("Most courts are reluctant to grant summary judgment prior to the termination of discovery.... [I]n situations ... where a plaintiff must obtain a good deal of information from the opposing party, judgment should be withheld until the discovery process has been completed.") Therefore, the motion for summary judgment is denied.

## CONCLUSION

For the foregoing reasons, the settler-defendant's motion to dismiss and defendant Clairol's motion to strike the complaint, or in the alternative for summary judgment, are denied.