### CENTRAL MAINE POWER CO., Plaintiff,

v.

### F.J. O'CONNOR CO., William R. O'Connor, John J. O'Connor, and Westinghouse Electric Co., Defendants.

Civ. No. 91–0251–B.

United States District Court, D. Maine.

Nov. 8, 1993.

Mark L. Haley, Conley, Haley O'Neil & Kaplan, Bath, ME, William H. Laubenstein III, Central Maine Power Co., Augusta, ME, for plaintiff.

Philip D. Buckley, Rudman & Winchell, Bangor, ME, Kevin K. Douglass, George E. Yokitis, Babst, Calland, Clements & Zomnir, Pittsburg, PA, for defendant Westinghouse.

Severin M. Beliveau, Preti, Flaherty, Beliveau & Pachios, Augusta, ME, for defendants O'Connor.

## MEMORANDUM OF DECISION AND ORDER

BRODY, District Judge.

The present owner of a hazardous waste site, Central Maine Power (CMP), brings this contribution action against the former owners and operators of the site, F.J. O'Connor Company, William R. O'Connor, John J. O'Connor (the O'Connors); and against an arranger for disposal, Westinghouse Electric Company, in an attempt to recover response costs incurred by CMP to clean up the site pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§ 9601–9675. CMP also requests a declaratory judgment establishing the liability of the parties for the expenses of future remedial action at the site.

## I. BACKGROUND

The subject of this action is a parcel of land in Augusta Maine that the Environmental Protection Agency (EPA) placed on the National Priorities List in 1983. The O'Connors, formerly owned this site and used it to scrap equipment largely from the electrical utility industry.[1] Plaintiff CMP, an electric utility with headquarters in Augusta, and Defendant Westinghouse, a major supplier of electrical equipment with a repair facility in Augusta, both arranged for the disposal of electrical equipment scrap at the O'Connors' site during the period of roughly 1952–1978. The electrical equipment consisted primarily of transformers, lead wire, and some capacitors. The O'Connors conveyed the site to CMP in March 1992.

The primary contaminant at the site is polychlorinated biphenyls (PCBs).[2] PCBs were used for thirty or forty years by the electric utility industry as a dielectric fluid in transformers. Capacitors were generally filled with pure PCB fluid while most transformers were filled with mineral oil.

Unfortunately, mineral oil used to fill transformers was frequently contaminated with PCBs during manufacture or service. The EPA has estimated that 38% of all mineral oil transformers are contaminated with between 50 and 500 parts per million PCBs. None of the parties had any knowledge of this contamination until 1976. Between 1956 and 1977, CMP sent approximately 26,000

---

[1] William R. O'Connor purchased the site in 1952 and, in 1977, transferred it to the F.J. O'Connor Company, which is owned by William R. and John J. O'Connor.

[2] Other contaminants identified at the site include lead and carcinogenic polycyclic aromatic hydrocarbons (cPAHs) but several witnesses testified that these contaminants combined account for less than 5% of the anticipated total clean-up costs.

mineral-oil transformers to the site for scrapping by the O'Connors.

When the O'Connors received transformers and capacitors at the site, they emptied whatever dielectric fluid the equipment contained directly onto the ground. The oil from the transformers simply drained into a lagoon system built by the O'Connors. The O'Connors then burned the transformers and capacitors to remove any remaining oil before they were sold for scrap.

The site became riddled with PCB contamination and in 1983, the EPA placed the site on the National Priorities List. In 1986 and 1987, the EPA, CMP, and the O'Connors entered into a number of Administrative Orders by Consent to begin clean-up efforts. In 1989, the EPA issued its Record of Decision regarding the site, and, in 1990, CMP entered into a consent decree with the EPA. CMP alleges that it has spent almost four million dollars in its cleanup efforts and anticipates that it will incur total expenses of up to twenty-five million dollars before the clean-up is completed.

## II. CERCLA FRAMEWORK

In 1980, in response to widespread concern that deposits of hazardous substances at various sites throughout the country were posing serious public health problems, Congress enacted the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§ 9601–9675. *United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 258 (3d Cir.1992) (citing Senate Comm. on Envtl. and Public Works, *A Legislative History of the Comprehensive Environmental Response, Compensation and Liability Act of 1980*, S.Doc. No. 14, 97th Cong., 2d Sess. pt. 1, at 320 (1983)). This complex piece of legislation authorized funds for an enormous clean-up program known as the Superfund program and provided statutory authority to hold operators of and contributors to hazardous waste sites strictly liable for clean-up costs. *Transtech Indus.,*

*Inc. v. A & Z Septic Clean,* 798 F.Supp. 1079, 1084 (D.N.J.1992) (citing 42 U.S.C. § 9607). CERCLA provides that persons who owned or operated a hazardous waste facility, who disposed of or arranged for the disposal of hazardous substance at such a facility, or who accepted hazardous substances for transport to disposal will be held liable for clean-up costs. 42 U.S.C. § 9607(a).

As originally enacted, CERCLA left unanswered the question whether, in cases with more than one liable party, a liable party could bring a private action against another liable party or parties for "contribution." [3] *Burlington N. R.R. v. Time Oil Co.,* 738 F.Supp. 1339, 1341 (W.D.Wash.1990). In response, some courts looked to traditional common law contribution principles to allocate responsibility among liable parties. *See, e.g., United States v. Conservation Chem. Co.,* 619 F.Supp. 162, 226–29 (W.D.Mo.1985) (citing Restatement (Second) of Torts § 886A)). In 1986, however, Congress amended CERCLA by enacting the Superfund Amendments and Reauthorization Act of 1986, Pub.L. No. 99–499, 100 Stat. 1613 (Oct. 17, 1986) (SARA) (codified as amended in scattered sections of 42 U.S.C.), to expressly provide for contribution actions. Included in SARA was § 9613(f) which provides that:

> [a]ny person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title.

42 U.S.C. § 9613(f)(1).

■ A party who has voluntarily agreed to perform certain actions pursuant to a settlement agreement, like CMP, is entitled to bring an action for contribution. *See Transtech Indus.,* 798 F.Supp. at 1086 (citing *Amoco Oil Co. v. Borden, Inc.,* 889 F.2d 664, 672 (5th Cir.1989)). In a contribution action, the plaintiff must show, first, that the defendants are liable under § 9607(a); and then

---

**3.** "Under general legal principles, a claim for contribution is one in which one liable party attempts to recover from another potentially liable party for its share of the cost." *Transtech Indus., Inc. v. A & Z Septic Clean,* 798 F.Supp.

1079, 1086 (D.N.J.1992) (citing *Northwest Airlines, Inc. v. Transport Workers Union of Am.,* 451 U.S. 77, 87–88, 101 S.Ct. 1571, 1578–1579, 67 L.Ed.2d 750 (1981)).

plaintiff may recover contribution from those found liable pursuant to § 9613(f)(1). *Transtech,* 798 F.Supp. at 1086.

## III. CONTRIBUTION ANALYSIS

### A. CERCLA Liability

None of the parties seriously challenge their liability under § 9607. The O'Connor defendants are clearly liable as persons "who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of" because of their activities as owners and operators of the site. 42 U.S.C. § 9607(a)(2). Westinghouse is liable as a "person who by contract, agreement, or otherwise arranged for disposal or treatment ... of hazardous substances owned or possessed by such person...." 42 U.S.C. § 9607(a)(3). CMP is liable under CERCLA both as the owner of the site, 42 U.S.C. § 9607(a)(1), and as a person arranging for disposal of hazardous waste, 42 U.S.C. § 9607(a)(3).

### B. Contribution

■ Section 9613(f)(1) provides that "[i]n resolving contribution claims, the court may allocate response costs among liable parties using *such equitable factors as the court determines are appropriate.*" 42 U.S.C. § 9613(f)(1) (emphasis added). Congress suggested some relevant factors in CERCLA's legislative history. In 1980, then-Senator Gore introduced a bill to amend the joint and several liability provisions of CERCLA. This bill would have allowed a court to apportion damages according to the following criteria:

  (i) the ability of the parties to demonstrate that their contribution to a discharge release or disposal of a hazardous waste can be distinguished;

  (ii) the amount of the hazardous waste involved;

  (iii) the degree of toxicity of the hazardous waste involved;

  (iv) the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste;

  (v) the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and

  (vi) the degree of cooperation by the parties with Federal, State, or local officials to prevent any harm to the public health or the environment.

*United States v. A & F Materials Co.,* 578 F.Supp. 1249, 1256 (S.D.Ill.1984). The legislative history of SARA suggests that the "Gore factors," so-called, are relevant criteria for courts to use in contribution actions. H.R.Rep. No. 253, 99th Cong., 1st Sess. 19, *reprinted in* 1986 U.S.C.C.A.N. 2835, 3042; *see also Amoco Oil Co. v. Dingwell,* 690 F.Supp. 78, 86 (D.Me.1988), *aff'd sub nom. Travelers Indem. Co. v. Dingwell,* 884 F.2d 629 (1st Cir.1989) (applying these factors).

The Gore factors are not exhaustive. *Environmental Transp. Sys., Inc. v. Ensco, Inc.,* 969 F.2d 503, 509 (7th Cir.1992). In contribution actions, courts have also considered the "[f]inancial resources of the parties involved, [and] ... benefits received by the parties from contaminating activities and the knowledge and/or acquiescence of the parties in the contaminating activities." *U.S. Steel Supply, Inc. v. Alco Standard Corp.,* No. 89 C 20241, 1992 WL 229252 at *14 (N.D.Ill. September 9, 1992) (citations omitted). In cases involving property owners, courts have considered "the circumstances and conditions involved in the property's conveyance, including the price paid and discounts granted." *Amoco Oil Co.,* 889 F.2d at 673 (citing *Smith Land & Improvement Corp. v. Celotex Corp.,* 851 F.2d 86, 90 (3d Cir.1988) *cert. denied,* 488 U.S. 1029, 109 S.Ct. 837, 102 L.Ed.2d 969 (1989)).

■ Westinghouse placed significant emphasis on the first three Gore factors in arguing that CMP should bear the majority of the clean-up costs. Although it is unclear exactly how much electrical scrap Westinghouse sent to the site, it is quite clear that CMP sent considerably more electrical scrap to the site than did Westinghouse. CMP records state that CMP sent 66 capacitors to the site for scrap. The capacitors used by

CMP generally contained between 1.3 to 4.3 gallons of pure PCB-fluid of which about one-half of one gallon could be drained. It appears that the capacitors were generally drained before being sent to the site.[4] Westinghouse sent no capacitors to the site.

CMP also sent 26,000 mineral-oil transformers to the site to be scrapped, the majority of which were full of fluid. A standard pole-mounted transformer contains about 8.5 gallons of mineral oil. According to EPA estimates, 38% of all mineral oil transformers contain between 50 and 500 ppm PCBs. It is not clear how many transformers Westinghouse sent to the site;[5] but at least some of the transformers sent by Westinghouse were also full of mineral oil. CMP also sent some large transformers which used pure PCB fluid as a dielectric fluid to the site for scrap, but these transformers were drained prior to transport.

A small portion of the projected clean-up costs under the current plan is attributable to lead contamination. CMP sent hundreds of thousands of pounds of lead wire to the site, while Westinghouse sent no lead to the site.

Although CMP appears to have contributed the majority of the hazardous waste in this site, "[i]n a dispute between waste generators and the site operator, the last three [Gore] factors ... are most important...." *Dingwell*, 690 F.Supp. at 86. The degree of involvement of the parties is equally proportionate. Both CMP and Westinghouse were "fully involved" in generating and arranging for the disposal of the waste, and the O'Connors were "fully involved" in the treatment and disposal of the waste. *See id.*

Despite allegations to the contrary, the Court is persuaded that all of the parties acted reasonably under the circumstances and used due care during the initial phase of the contamination. Although the O'Connors poured PCB-contaminated fluid directly into the ground, they were not aware at that time that PCBs were dangerous. When concern over the toxicity of PCBs arose in the early 1970s, CMP stopped sending articles known to contain PCBs to the site. Because it was not aware of the contamination of its mineral-oil transformers, CMP continued to send mineral-oil transformers to the site. Westinghouse, the manufacturer of many of CMP's contaminated mineral-oil transformers, did not know of the contamination of its transformers until 1976.

The degree of cooperation with government officials to prevent any harm to the public health or the environment is very important in the contribution analysis. A major concern of Congress in enacting SARA was to effectuate quick and efficient clean-ups in part by "provid[ing] incentives for settlements with the government [while] also [assuring] that liable parties could seek restitution from other ... liable parties." *Transtech*, 798 F.Supp. at 1085. CMP's cooperation with government officials has been exemplary. CMP entered into a consent decree with the EPA and has completely funded the clean-up efforts already undertaken. The O'Connors, although not parties to the consent decree, have cooperated with the Maine Department of Environmental Protection in their operation of the site. The O'Connors also conveyed the 65-acre parcel of land on which the 28-acre contaminated site is located to CMP in order to facilitate clean-up efforts. Westinghouse's cooperation

---

4. The record does not clearly reflect how many capacitors were full when they arrived at the site. CMP witnesses testified that capacitors were often punctured and drained before handling and disposal. There were two capacitors found on the site. The soil around these two units was found to contain high concentrations of PCB fluid, Arochlor 1242, which is commonly found in capacitors. Much of the remaining soil at the site was contaminated with PCB fluid, Arochlor 1260, which is sometimes used in transformers but never in capacitors.

5. Westinghouse received 7400 transformers from CMP for repair during the period of 1960 to 1976, but it is unclear how many of these were actually scrapped. Furthermore, Westinghouse also received transformers from several other customers. These customers include: Loring Air Force Base, Brunswick Naval Air Station, US Naval Security, Killory Naval Air Station, Bath Iron Works, International Paper, Brown Company (now James River), Scott Paper, S.D. Warren, Georgia Pacific, Frazier Paper, Boise Cascade, Great Northern Paper, Lincoln Paper, and Pioneer Plastics.

has not risen to the level of that of CMP and the O'Connors. Westinghouse was invited to participate in the consent decree negotiations between CMP and the EPA somewhat late in the process, but chose not to participate in those negotiations. Westinghouse also has not paid any of the clean-up costs incurred to date.

Each of the parties received financial benefits from the O'Connor scrap business during its operation. *See U.S. Steel Supply*, 1992 WL 229252 at *14. The O'Connors paid CMP over $250,000 for its scrap transformers and paid Westinghouse about $60,000 for its scrap transformers.

Also relevant to this contribution action are the relative financial resources of the parties. *See U.S. Steel Supply*, 1992 WL 229252 at *14. Although the O'Connors are not without assets, the record is clear that Westinghouse and CMP are better situated financially to absorb the substantial expense of this clean-up.

In weighing the various factors, the Court also takes into consideration the circumstances and conditions involved in the conveyance of the site property. *See Amoco Oil Co.,* 889 F.2d at .673. The O'Connors conveyed the site that had an appraised value of $238,000 to CMP without remuneration.

After carefully weighing all of the equities in the context of the Gore factors and in light of the stated goals of Congress in enacting CERCLA, this Court finds that the parties are responsible for past and future clean-up costs and expenses based on the following percentages: CMP—46.5%, Westinghouse—41%, and the O'Connors—12.5%. To the extent, however, that future clean-up costs can be directly attributable to lead contamination, the cost for those lead clean-up expenses shall be apportioned as follows: CMP—67% and the O'Connors—33%.[6] Because there was no evidence introduced to distinguish the participation of the O'Connor defendants, i.e., F.J. O'Connor Co., William

R. O'Connor, and John J. O'Connor, from each other; these three defendants are to be held jointly and severally liable for the total percentage attributed to "the O'Connors."

## IV. DAMAGES

### A. Recovery for Past Damages

Section 9607(a) provides that a person is only liable for private party clean-up costs to the extent that the costs incurred were "necessary" and "consistent with the national contingency plan." [7] 42 U.S.C. § 9607(a); 40 C.F.R. § 300.700(c)(2) (1992); *see also County Line Inv. Co. v. Tinney*, 933 F.2d 1508, 1511 (10th Cir.1991) (consistency with the national contingency plan required in contribution actions). At the outset, the Court notes that CMP has voluntarily removed $252,998 in expenses challenged by Westinghouse from its original expense list.

#### 1. Consistency with the National Contingency Plan

■ The national contingency plan provides an irrebuttable presumption that actions taken pursuant to the terms of an EPA consent decree are consistent with the plan. 40 C.F.R. § 300.700(c)(3)(ii) (1992). ("Any response action carried out in compliance with the terms of ... a consent decree entered into pursuant to section 122 of CERCLA, will be considered 'consistent with the [national contingency plan].'"). Therefore, all actions taken by CMP pursuant to the terms of the consent decree are deemed consistent with the national contingency plan.

CMP asserts that its costs incurred prior to entering into the consent decree were for investigatory and monitoring activities and therefore need not comply with the national contingency plan. Several courts have agreed with this position. *See Marriott Corp. v. Simkins Indus., Inc.*, 825 F.Supp. 1575, 1583 (S.D.Fla.1993) ("[investigatory]

---

6. There is nothing in the record to suggest that Westinghouse contributed any lead to the site and, therefore, the Court is convinced that Westinghouse should not be liable for any costs attributable to lead contamination.

7. The national contingency plan is "a set of regulations that 'establish[es] procedures and standards for responding to releases of hazardous substances.'" *County Line Inv. Co. v. Tinney*, 933 F.2d 1508, 1511 (10th Cir.1991) (quoting 42 U.S.C. § 9605 and citing 40 C.F.R. Part 300 (1988)).

costs are recoverable irrespective of their consistency with the [national contingency plan].""); *Carlyle Piermont Corp. v. Federal Paper Bd. Co.*, 742 F.Supp. 814, 821 (S.D.N.Y.1990) ("liability for [investigatory] costs may be granted irrespective of the [national contingency plan]").

■ The Court need not reach the question of whether investigatory costs are recoverable regardless of compliance with the plan because it is persuaded that the costs incurred by CMP before entering into the consent decree are in substantial compliance with the national contingency plan. Westinghouse contends that CMP's costs must be in strict compliance with the national contingency plan in order to be recoverable. Strict compliance was required under the 1985 plan but, in 1990, the plan was revised and the compliance requirements were liberalized. *Tri–County Business Campus Joint Venture v. Clow Corp.*, 792 F.Supp. 984, 990–91 (E.D.Pa.1992) (citing 40 C.F.R. Part 300 (1988) and 40 C.F.R. Part 300 (1990)). Under the 1990 plan, "private party response action will be considered 'consistent with the NCP' if the action, when evaluated as a whole, is in substantial compliance with the applicable requirements in [the plan], and results in a CERCLA-quality cleanup." 40 C.F.R. §§ 300.700(c)(3)(i) (1992); *see also* 40 C.F.R. § 300.700(c)(4) (1992) ("Actions [of a private party] will not be considered not 'inconsistent with the [plan],' based on immaterial or insubstantial deviations from the provisions of [the plan].""). The 1990 plan expressly provides that its definition of consistency with the plan applies to "clean-ups that are already underway as of the effective date [April 9, 1990]." *Id.* at 990. CMP's response was underway by April 9, 1990, and when evaluated as a whole, was in substantial compliance with the plan and will result in a CERCLA-quality clean-up.

## 2. Necessary Costs

In order to recover contribution, however, CMP's expenses must be incurred for "necessary" response costs. 42 U.S.C. § 9607(a). Westinghouse challenges several expenses as unnecessary.

### a. EPA Oversight Expenses

■ CMP paid the EPA $230,356.12 as reimbursement for expenses that the EPA incurred while overseeing CMP responses to the site. Westinghouse asserts that these costs should not be recoverable and the Court agrees. "[I]f what the government is monitoring is not the release or hazard itself, but rather the performance of a private party, the costs involved are nonrecoverable oversight costs." *United States v. Rohm & Haas Co.*, 2 F.3d 1265, 1279 (3d Cir.1993). Because CMP was not required to reimburse the EPA for the its oversight expenses under CERCLA, *see id.*, these expenses are not "necessary response costs." 42 U.S.C. § 9607(a).

### b. Solvent Extraction

■ Westinghouse presented expert testimony concluding that the solvent extraction method agreed to in the consent decree cannot cost-effectively achieve the clean-up standard selected by the EPA. CMP's expert witness agreed. Despite CMP's unsuccessful results in the preliminary testing of this method, the EPA intractably refused to amend its clean-up standard or to consider another method. Under the circumstances, CMP's acquiescence to this method was not unreasonable.

Westinghouse also asserts that CMP should have exercised the review option provided in the consent decree. This option, however, can only be exercised once; and, although CMP's early studies confirmed its expert's pessimism, CMP decided further testing would be required to convince the EPA of the limits of solvent extraction. This decision appears to have been sound since the EPA informed CMP that "[i]t is not clear whether or not the cleanup standards can be cost-effectively achieved [with solvent extraction] because the pilot-scale studies performed by CMP do not provide adequate or reliable data that would serve as the basis for that decision." The expenses incurred thus far involving solvent extraction testing are, under the circumstances, necessary response costs.

### 3. Two Bench–Scale Studies

■ CMP used two vendors to perform studies at the bench-scale studies. Westinghouse contends that using two vendors was duplicative. The Court rejects Westinghouse's contention. The Court is persuaded that, first, the work done by each vendor was different; and second, involving two vendors in the bench-scale study enhanced the competitiveness of the bidding at the pilot-scale study. These expenses are also recoverable.

### 4. The EPRI Study

■ Westinghouse challenges money spent by CMP in collaboration with the Electric Power Research Institute (EPRI). CMP spent approximately $45,000 for reports not otherwise required in the clean-up efforts. As a result of these reports, however, EPRI provided $255,000 in matching funds for pilot studies required by the consent decree.[8] Because this cooperative venture will result in a net savings to the parties of about $210,000 in clean-up costs, CMP's expenses associated with the venture are recoverable.

### 5. Other Expenses

[10] Westinghouse challenges $68,622 of CMP's sampling costs as unnecessary and duplicative. Westinghouse's expert witness, Dr. Roffman, testified that 52 grid samples taken during the initial remedial investigation and feasibility study, at a cost of $15,600, and hazardous substances testing, at a cost of $13,127, were excessive because they duplicated tests already done by the EPA. She also testified that CMP spent $39,895 in excess confirmation testing by sending 22% of its samples to the contract laboratory program. Generally, only about 5% of samples are sent for this type of testing. The Court found Dr. Roffman's testimony persuasive and concludes that these expenses were not necessary response costs.

■ The Court rejects Westinghouse's challenge to the $251.62 spent on permitting fees. The national contingency plan does provide an exemption from permitting re-

quirements, 40 C.F.R. § 300.400(e)(1) (1992); but the plan also provides that "the permit waiver does not apply to private party response actions." 40 C.F.R. § 300.-700(c)(5)(iii) (1992).

The total past expenses for which CMP is entitled to recover from Defendants is $3,347,932.70.

### B. Recovery for Future Damages

Westinghouse and the O'Connors shall reimburse CMP for 41% and 12.5%, respectively, of all future necessary response costs incurred consistent with the national contingency plan; with the exception that for future expenses directly attributable to lead contamination, the O'Connors shall bear 33% of the expenses while Westinghouse should bear none. This reimbursement shall be promptly paid upon presentation of documentation of such expenses.

### V. CONCLUSION

The Court concludes that CMP has incurred $3,347,932.70 in necessary response costs. Westinghouse shall reimburse CMP for 41% of those costs, or $1,372,652.40. The O'Connors shall reimburse CMP for 12.5% of those expenses, or $418,491.59. As for future necessary response costs incurred by CMP consistent with the national contingency plan, Westinghouse is responsible for 41%, and the O'Connors 12.5%; with the exception of those expenses which are directly attributable to lead contamination of which Westinghouse bears no responsibility and the O'Connors must pay 33%.

*SO ORDERED.*

---

8. CMP and EPRI each paid $255,000 into an EPRI escrow account from which pilot-scale studies are paid.