**ELF ATOCHEM NORTH AMERICA, INC.**

v.

**UNITED STATES** of America, United States Department of Commerce, Barbara Franklin, Secretary of Commerce, in her Official Capacity, General Services Administration, Richard G. Austin, Administrator, General Services Administration, in his Official Capacity, United States Department of Defense, Dick Cheney, Secretary of Defense, in his Official Capacity, United States Department of the Army, Michael P.W. Stone, Secretary of the Army, in his Official Capacity, and Witco Corporation.

Civ. A. No. 92–CV–7458.

United States District Court, E.D. Pennsylvania.

Sept. 1, 1993.

**490**

Michael A. Bogdonoff, William J. Kennedy, Dechert, Price & Rhoads, Philadelphia, PA, for plaintiff.

Brud Rossmann, U.S. Dept. of Justice, Environmental Defense Section, Washington, DC, for U.S. et al.

Michael R. Lazerwitz, Charles F. Lettow, Cleary, Gottlieb, Steen & Hamilton, Washington, DC, for Witco, Corp.

## MEMORANDUM AND ORDER

JOYNER, District Judge.

Elf Atochem brought this action pursuant to the Comprehensive Environmental Response Compensation and Liability Act of 1980, as amended, 42 U.S.C. §§ 9601–9675 (hereinafter "CERCLA"), the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, and the New Jersey Spill Compensation and Control Act, N.J.S.A. 58:10–23.11, *et seq.* ("Spill Act") against the United States and Witco Corporation ("Witco").[1] Plaintiff seeks contribution for costs it has and will incur in its cleanup of hazardous materials at a New Jersey Superfund site.

Presently before the Court is Witco's motion for summary judgment[2] on Counts II–VI of Plaintiff's complaint[3]. Under Rule 56(c), this Court must consider whether the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact, and whether the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). We must determine whether the evidence can reasonably support a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In making this determination, all reasonable inferences must be drawn in favor of the non-moving party. *Id.*, 477 U.S. at 256, 106 S.Ct. at 2512.

█ An issue is "genuine" if the fact-finder could reasonably hold in the non-movant's

---

1. Elf Atochem is a Pennsylvania corporation with its principal place of business in Philadelphia, Pennsylvania. Witco is a Delaware corporation with its principal place of business in New York. Defendant conducts business within the Eastern District of Pennsylvania, at its Trainer, Pennsylvania location.

2. Witco originally sought to dismiss Counts II–VI under Fed.R.Civ.P. 12(b)(6), as failing to state a claim upon which relief could be granted. However, because the motion went beyond the pleadings, this Court must treat the motion as one for summary judgment under Rule 56(c). In accordance with Rule 12(b)(6), we have therefore giv-

en both parties notice and ample time to submit supporting material for consideration.

3. Count I, not subject to this motion, is a CERCLA claim for contribution against the United States.

Counts II–VI are against Witco. Count II is a CERCLA claim for contribution. Count III is a claim for contribution based upon the New Jersey Spill Act. Counts IV–VI are claims for contribution based upon the New Jersey Joint Tortfeasors Contribution Act, N.J.S.A. 2A:53A–1, *et seq.*, and common law theories of negligence (IV), strict liability (V), and nuisance (VI).

favor with regard to that issue. *Id.,* 477 U.S. at 247–248, 106 S.Ct. at 2509–10. A fact is material if it influences the outcome under the governing law. *Id.* at 248, 106 S.Ct. at 2510.

■ While the movant bears the initial burden of demonstrating the absence of genuine issues of material fact, the non-movant must then establish the existence of each element of its case. *J.F. Feeser, Inc. v. Serv–A–Portion, Inc.,* 909 F.2d 1524, 1531 (3rd Cir.1990), *citing Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.ed.2d 265 (1986). The burden of persuasion always remains with the moving party. Summary judgment should not be granted if there remains any doubt as to whether a trial is necessary. *Transtech Industries, Inc. v. A & Z Septic Clean,* 798 F.Supp. 1079, 1082 (D.N.J.1992).

## I. FACTS

Before discussing the merits of Defendant's motion, we find it helpful to examine the underlying facts of the case viewed in the light most favorable to the Plaintiff.

The site which is the subject of the complaint is located at Pittstown, Franklin Township, Hunterdon County, New Jersey. The site includes approximately five acres presently owned by Elf Atochem[4], part of adjoining privately-owned properties, and approximately two acres of undeveloped land owned by the State of New Jersey and designated as wetland.

From approximately 1927–1959, several entities manufactured chemicals and pesticides at the Pittstown site.[5] Former corporate owners or operators include, among others, W.A. Allen Company (1927–1932), Lord Stiling Distilleries, Inc. (1933–1940), Elko Chemical Works ("Elko") (1942–1945), Pennsylvania Salt Manufacturing Company and Pennsalt Chemicals Corporation (collectively, "Pennsalt") (1945–1947), Associated Terminal, Inc. (1947–1971) and Clinton Chemical Company ("Clinton") (1953–1959).[6] Elf Atochem is the corporate successor to Pennsalt. Witco is the corporate successor to Clinton.[7]

Elko and Pennsalt[8] both manufactured DDT under the control of the Government during their tenure at the site. Clinton principally produced anhydrous (dry) aluminum chloride. Clinton also produced dried copper sulfate, dried magnesium sulfate, and other materials.

In 1983, having determined the Pittstown site was contaminated with hazardous substances, the United States Environmental Protection Agency ("EPA") listed the site on the National Priorities List ("NPL") authorized under § 105 of CERCLA. The EPA performed a Remedial Investigation and Feasibility Study (RI/FS) at the site. The Agency's responsiveness survey, a response to public comments and concerns, explains

4. This land was previously owned by Mr. and Mrs. Cornelius Myers, Jr. On May 24, 1993, Plaintiff exercised their option to purchase this land from the couple.

5. From 1942 through 1945, a portion of the site was used to manufacture chemicals for the United States Government as part of the World War II effort. During the first few years of this period, arsenic trichloride was manufactured at the site for the Government under the control of the Chemical Warfare Service, then part of the Department of War. Beginning in 1944 and continuing through the end of the war, the pesticide DDT was produced at the site under the direction and control of the War Production Board. During the entire war era, hazardous substances were released from the site into the environment. Both prior to and after this period, various other manufacturing activities by other entities took place at the site, including the manufacture of anhydrous aluminum chloride, dried copper sulfate, and dried magnesium sulfate.

6. Clinton rented several buildings on the site from Associated Terminal. According to Witco, Clinton ceased renting at the site in 1959 and moved all of its equipment off the site. Clinton became Pearsall Chemical in 1961, and Witco purchased controlling shares of Pearsall in 1980.

7. For ease of reference throughout the following discussion, each of the above-mentioned entities will be referred to in their present-day form. Therefore "Elf Atochem" includes Pennsalt, and "Witco" includes Clinton.

8. In late 1944, Elko assigned its interest in the site and related Government DDT contracts to Pennsalt, and the deed to the property was transferred from Elko to Pennsalt on March 19, 1945. Elf Atochem is neither related to nor the corporate successor to Elko.

that the "primary contaminants of concern at the site" were pesticides and related chemicals. *See* EPA Responsiveness Summary (RS) 39, (Witco's Exhibit A). However the EPA also listed inorganic compounds [9], which may have resulted from Witco's operations.

In 1990 and 1991, the EPA notified Elf Atochem and Witco that the Agency considered them as potentially responsible parties, and sought settlement for response costs. Elf Atochem agreed to enter into a Judicial Consent Decree, which was entered in the United States District Court for the District of New Jersey. In the Consent Decree, Elf Atochem agreed to reimburse the EPA for $2,700,000 in response to costs already incurred, and to pay for the performance of necessary response actions in the future. Thus far, Plaintiff is the only party responsible for these costs, which the EPA has estimated will exceed $45,000,000.

We now consider Defendant's motion for summary judgment with respect to each of Plaintiff's claims.

## II. CERCLA CLAIMS

CERCLA was enacted in 1980 in response to public concern about the improper disposal of hazardous wastes. As the Third Circuit explained in *United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 258 (3rd Cir.1992), Congress sought to achieve two goals: the EPA's prompt and effective response to hazardous spills, and that the party responsible for the spill bear the clean-up costs incurred.

In 1986, Congress enacted the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), Pub.L. No. 99–499, 100 Stat. 1613 (1986), to clearly provide liable parties with a right of contribution from other Potentially Responsible Parties ("PRP"). *Transtech Industries, Inc. v. A & Z Septic Clean,* 798 F.Supp. 1079, 1085 (D.N.J.1992). SARA includes § 113(f)(1) of CERCLA, which provides "any person may seek contribution from any person who is liable or potentially liable under section 107(a) ..." 42 U.S.C. § 9613(f)(1). Allocation of response costs is determined using "such equitable factors as the court determines are appropriate." 42 U.S.C. § 9613(f)(1).

Plaintiff's CERCLA action is one for contribution. *See, e.g. Amoco Oil Co. v. Borden, Inc.,* 889 F.2d 664, 672 (5th Cir.1989) (when one liable party sues another Potentially Responsible Person for its share of response costs incurred, the claim is one of contribution). Under § 9613(f), Plaintiff must first prove Defendant is a responsible party under § 107(a).

Section 107(a) of CERCLA sets out what a plaintiff must prove to make out a prima facie case for the imposition of liability upon a party for clean-up costs. These four elements are:

(1) The defendant falls within one of the four listed categories of responsible parties [10];

(2) hazardous substances [11] were disposed

---

**9.** These include aluminum, antimony, arsenic, copper, chromium, iron, manganese, lead, silver, zinc, and asbestos. These are all classified as hazardous under CERCLA. 42 U.S.C. § 9601(14).

**10.** The categories of "responsible parties" include:

"(1) the owner and operator of a vessel or a facility, (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of, (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity, at any facility or incineration vessel owned or operat-

ed by another party or entity and containing such hazardous substances, and (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities ..." 42 U.S.C. § 9607(a).

**11.** A "hazardous substance" is defined as:

(A) any substance designated pursuant to § 1321(b)(2)(A) of Title 33, (B) any element, compound, mixture, solution, or substance designated pursuant to section 9602 of this title, (C) any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act [42 U.S.C. § 6921] (but not including any waste the regulation of which under the Solid Waste Disposal Act [42 U.S.C. § 6901 et seq.] has been suspended by Act of Congress), (D) any toxic pollutant listed under section 1317(a) of Title 33, (E) any hazardous air pollutant listed under section 112 of the Clean Air Act

at a facility[12];

(3) from which there is a release[13] or threatened release of hazardous substances from the facility into the environment; and

(4) the release causes the incurrence of response[14] costs. 42 U.S.C. § 9607. *See also: Alcan Aluminum Corp.,* 964 F.2d 252, 258–59 (3rd Cir.1992).

The facts viewed most favorably to the Plaintiff show Defendant falls within the class of potentially responsible persons under § 107(a). Witco operated their chemical manufacturing business on the site for approximately six years, thereby falling within the "owner or operator" class under § 107(a)(2).

The Pittstown site and buildings unquestionably meet the broad definition of "facility" under § 101. As explained above, the EPA has found that hazardous materials have "come to been located" throughout the site. The EPA has determined there have been actual or threatened releases of hazardous substances from the site. EPA Record of Decision: Declaration Statement. (Witco, Exhibit A).

The release or threatened release of the hazardous materials on the site caused the EPA to incur the original $2.7 million in response costs using Superfund assets. The EPA, in turn, filed a § 107 action against Elf Atochem to recover those costs and secure future payment of response costs. Pursuant to the Consent Decree from that action, Elf Atochem has and will continue to incur response costs.

The first real issue is whether Witco falls within the class of PRPs described in § 107(a). It is undisputed that Witco was an "operator" of a facility during its tenure at the site. However, Defendant claims to have run a "clean" operation, and denies that they disposed of hazardous materials on the site. Therefore, the Defendant argues it should not be held liable for any response costs. However, for the reasons outlined below, we are unable to rule, as a matter of law, that hazardous substances were not disposed[15] of at the site during Witco's tenure.

The record allows us to reasonably infer that hazardous waste was disposed on the site during Defendant's tenure. Defendant admits venting aluminum chloride fumes into the atmosphere through an exhaust fan. Smith Dep. at 73, Pearsall Dep. at 46–48. "Once exposed to the atmosphere, aluminum chloride oxidized very rapidly to form alumina ... and hydrochloric acid."[16] Witco Memorandum at 13–14, citing Pearsall Dep. at 55–56, 65. In addition, when the solid aluminum chloride was crushed and screened, aluminum chloride dust in large amounts was "blown right out through the wall into the yard." Pearsall Dep. at 55. There were also frequent releases from spills, reaction runaways, upsets, corrosion leaks, etc. Pearsall Dep. at 50. Chlorine occasionally leaked from railroad storage tank cars.[17]

The EPA has found aluminum present at well-above ambient levels in soil samples taken on site. ROD, Tables 1, 2, 3. Aluminum is not designated as a hazardous substance

[42 U.S.C. § 7412], and (F) any imminently hazardous chemical substance or mixture with respect to which the Administrator has taken action pursuant to section 2606 of Title 15 ..." 42 U.S.C. § 9601(14).

**12.** A facility is "any building structure ... or any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise came to be located ..." 42 U.S.C. § 9601.

**13.** A "release" is broadly-defined as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment ..." 42 U.S.C. § 9601.

**14.** "Response" means removal, remedial action, and related enforcement activities. 42 U.S.C. § 9601.

**15.** CERCLA defines "disposal" as the "discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land ..." 42 U.S.C. § 9601(29), incorporating 42 U.S.C. § 6903.

**16.** Hydrochloric acid is a hazardous substance under CERCLA.

**17.** Chlorine is a CERCLA hazardous substance. 40 C.F.R. § 302.4. However, the EPA has set no remedial goals for elemental chlorine at the site.

under CERCLA,[18] and is not currently targeted as a significant health risk by the EPA.[19] However, the amount of aluminum released by Defendant into the environment allows us to reasonably infer that their operations were not as clean as they claim.

Other evidence presented by the plaintiff support this inference. For example, the scrap aluminum used by Witco in its aluminum chloride process contained hazardous metal impurities which remained after the reaction. The by-products[20] included antimony, zinc, copper, and lead, all of which are hazardous substances under Section 101(14) of CERCLA. 42 U.S.C. § 9601(14). About 25–30 pounds of this material was created during each 8 hour shift. The EPA found these metals were present at the site, and the Consent Decree provides for their removal by the Plaintiff via soil-washing. Consent Decree at 11, RS at 13–14.

██ Other hazardous materials, including copper and lead, handled by Witco were found almost as frequently as aluminum. Defendant claims the presence of copper is not significant, because aluminum chloride was "99.9%" of its manufacturing operations on site. However, this argument too must fail, because quantity or concentration is not a factor in determining whether a substance is hazardous. *B.F. Goodrich Co. v. Murtha,* 958 F.2d 1192, 1200 (2nd Cir.1990); *United States v. Wade,* 577 F.Supp. 1326, 1339–40 (E.D.Pa.1983). Based on the evidence advanced, and the inferences we can reasonably draw from it, we cannot rule that Witco did not, as a matter of law, dispose of hazardous substances at the site.

██ Witco next claims it should not be held liable because the EPA's response, remedy selection, and the Consent Decree were not "driven by" or "primarily directed" at cleaning up the chemicals it handled. Witco Memorandum at 23. This argument centers on the fact that pesticides and related chemicals are currently the primary contaminants of concern to the EPA at the site. RS at 39. As such, remedy selection centered upon that waste. Therefore, Witco argues the chemicals it handled did not cause Elf Atochem to spend any money.

Under § 107(a), it is not necessary for a plaintiff to prove a defendant's waste caused the release or the incurrence of response costs. *United States v. Alcan Aluminum Corp.,* 964 F.2d 252, 266 (3rd Cir.1992). In *Alcan,* the Third Circuit Court of Appeals explained that the "government must simply prove that defendant's hazardous substances were deposited at the site from which there was a release, and that the *release* caused the incurrence costs." *Id.* (Emphasis in original). Requiring a plaintiff to link a specific defendant with a specific release or response would prove too difficult for a plaintiff, especially in a multi-generator context. Therefore, Defendant's causation argument fails as to the § 107(a) liability aspect of Plaintiff's claim.

Witco relies upon a recent 8th Circuit decision to support its causation arguments. In *Farmland Industries, Inc. v. Morrison–Quirk Grain Corp.,* 987 F.2d 1335, 1340 (8th Cir.1993), the court, facing dueling § 9613 claims for indemnity, did state that "a private party cannot predicate a claim for contribution or indemnity solely upon § 9607(a) liability to the government, but must also prove causation." However, the court also explained that the proper focus of this requirement is the causation of the contaminants at the site, *not* the causation of response costs. *Id.* at 1342. We agree. In other words, the plaintiff must only show that the defendant caused contamination at the site, and therefore should pay its fair share of the clean-up costs. Requiring a stricter level of causation would place too onerous a burden upon a contribution plaintiff. This burden would eliminate the incentive § 9613 provides for

---

18. Plaintiff claims aluminum should be viewed as a hazardous substance. However, the same ROD which reported the prevalence of aluminum on site also stated "No RCRA materials were on site." ROD at 7.

19. However, as will be discussed in Count III, aluminum may be relevant under the New Jersey Spill Act.

20. Euphemistically labeled "dross" by Witco. Witco sold this dross to reclaimers, but it was considered a waste. Pearsall Dep. at 72.

PRP's to enter into similar Consent Decrees with the government.

■ As we have explained above, there are still substantial questions of fact as to whether Witco caused the contamination at the Pittstown site through their use, handling, and production of hazardous substances at the site. Therefore, Witco's motion for summary judgment is denied as to Count II of Elf Atochem's Complaint.[21]

## III. SPILL ACT CLAIM

We next consider Witco's motion for summary judgment as to Elf Atochem's claim for contribution under the New Jersey Spill Compensation and Control Act, as amended, N.J.S.A. 58:10–23.11, *et seq.* ("Spill Act"). Witco makes the same arguments against Plaintiff's Spill Act claim as it raised against the CERCLA claim.

■ The Spill Act is New Jersey's analog to CERCLA, designed to protect and preserve the State's lands and water. N.J.S.A. 58:10–23.11a. The Act mandates a liberal construction of its provisions. *Superior Air Products Co. v. N.L. Industries, Inc.,* 216 N.J.Super. 46, 60, 522 A.2d 1025 (App.Div. 1987); N.J.S.A. 58:10–23.11v.

■ Plaintiff's claim for contribution under the Spill Act is created and governed by N.J.S.A. 58:10–23.11f(a)(2), which provides:

"Whenever one or more dischargers or persons cleans up and removes a discharge of a hazardous substance, those dischargers and persons shall have a right of contribution against all other dischargers and persons in any way responsible for a discharged hazardous substance who are liable for the cost of the cleanup and re-

moval of that discharge of a hazardous substance. In an action for contribution, the contribution plaintiffs need prove only that a discharge occurred for which the contribution defendant or defendants are liable pursuant to the provisions of subsection c. of section 8 of P.L.1976, c. 141 (C.58:10–23.11g),[22] and the contribution defendant shall have only the defenses to liability available to parties pursuant to subsection d. of section 8 of P.L.1976, c. 141 (C.58:10–23.11g).[23] In resolving contribution claims, a court may allocate the costs of cleanup and removal among liable parties using such equitable factors as the court determines are appropriate."

Therefore, by its plain language, the Spill Act clearly provides Elf Atochem with a mechanism to recover cleanup costs if it can prove that Witco is "in any way responsible for any hazardous substance." [24]

Under the Spill Act, the term "hazardous substances" includes CERCLA hazardous material as well as certain substances listed by the New Jersey Department of Environmental Protection. N.J.S.A. 58:10–23.11b(k). The New Jersey Administrative Code specifically lists as hazardous chlorine, copper, lead, antimony, arsenic, and aluminum (fume or dust). N.J.A.C. 7:1E–Appendix A. As discussed above, these were handled by Witco in its operations at the site. We therefore must reject Witco's motion as to Plaintiff's Spill Act claim for essentially the same reasons as above. A question of material fact remains as to whether Witco is responsible for contamination at the site based upon the evidence presented. Accordingly, Witco's motion for summary judgment on Elf Atochem's Spill Act Contribution claim is denied.

---

**21.** In addition, we reject Witco's Due Process argument. CERCLA serves a legitimate government purpose as a remedy to the threat of widespread contamination of our land, and imposing absolute liability upon those who profited from hazardous substances, thereby serving this purpose in a rational manner. See, e.g., *United States v. Kramer,* 757 F.Supp. 397, 430 (D.N.J. 1991).

**22.** "Any person who has discharged a hazardous substance, or is in any way responsible for any hazardous substance, shall be strictly liable, jointly and severally, without regard to fault, for

all cleanup and removal costs no matter by whom incurred." [N.J.S.A. 58:10–23.11g(c)(1)]

**23.** "An act or omission caused solely by war, sabotage, or God, or a combination thereof, shall be the only defenses which may be raised ..." N.J.S.A. 58:10–23.11g(d).

**24.** This same result was reached by the District of New Jersey in *Borough of Rockaway v. Klockner & Klockner,* 811 F.Supp. 1039, 1052 (D.N.J. 1993).

## IV. STATE JOINT TORTFEASORS CONTRIBUTION ACT CLAIMS

Finally, we consider Witco's motion for summary judgment with respect to Plaintiff's claims under the New Jersey Joint Tortfeasors Contribution Act, N.J.S.A. 2A:53A–1, *et seq.* (Contribution Act). These claims are based upon common law theories of negligence, strict liability, and nuisance.

] New Jersey enacted the Contribution Act, based upon principles of equity, to insure the fair and just division of losses between responsible tortfeasors. See *Pennsylvania Greyhound Lines, Inc. v. Rosenthal,* 14 N.J. 372, 386, 102 A.2d 587 (1954) (the right to receive contribution "arises out of a payment in excess of the payor's just share of the common obligation ensuing from a common wrongful act, neglect or default ..."). The Contribution Act sought to correct the inequity which occurred under the common law "one-judgment" rule. See *Polidori v. Kordys, Puxio & Tomasso,*[25] 217 N.J.Super. 424, 429, 526 A.2d 230, 232 (App. Div.1987). Therefore, the Act established and made enforceable the right of contribution between wrongdoers.

The statutory right to contribution is set out, in relevant part, in § 2A:53A–3, as: "Where injury or damage is suffered by any person as a result of the wrongful act, neglect or default of joint tortfeasors[26], and the person so suffering injury or damage recovers a money judgment or judgments for such injury or damage against one or more of the joint tortfeasors, either in one action or in separate actions, and any one of the joint tortfeasors pays such judgment in whole or in part, he shall be entitled to recover contribution from the other joint tortfeasor or joint tortfeasors for the excess so paid over his pro rata share ..."

In *Sattelberger v. Telep,* 14 N.J. 353, 367, 102 A.2d 577, 584 (1954), the New Jersey Supreme Court described a contribution plaintiff's right and burden of proof:

"Under the statute, contribution is enforceable against a joint tortfeasor as therein defined; and so, by the very nature of the right and the correlative obligation, it is incumbent on the contribution claimant in a case such as this to establish a common liability for the wrongful act, neglect or default made on the basis of the judgment and the quantum of the damages ensuing from the joint offense. The plaintiff must prove that he and the defendant in contribution are in aequali jure; he cannot prevail unless the injured person also had a cause of action for the tortious injury against the defendant called upon for contribution. The onus of proof of the common burden is on the plaintiff demanding the sharing of the burden."

In supporting its motion for summary judgment, Witco argues that Counts IV–VI of Plaintiff's complaint should fail for failure to fulfill New Jersey's unique "judgment" requirement, and because the State's common law does not recognize the duties Plaintiff alleges were breached.

 As explained above, the existence of a "judgment" is an essential element in a claim for contribution. Unlike § 2 of the Uniform Contribution Among Tortfeasors Act, 12 U.L.A. 68 (1955), from which it is derived, the New Jersey Act does not recognize a right to contribution where plaintiff merely discharges a common liability. See *Pennsylvania Greyhound Lines, Inc. v. Rosenthal,* 14 N.J. at 383, 102 A.2d at 592. (Unlike the draft act submitted by the Commissioners on Uniform State Laws, ... our statute does not provide for contribution where the payment is made in fulfillment of a voluntary compromise or settlement of a claim for damages attributed to a joint tort-

---

**25.** "At early common law, a plaintiff could obtain but one judgment on a joint tort. Because the act of one joint tort-feasor was the act of all, it was considered that there was one cause of action which was merged in the judgment. Thus, a judgment against one defendant, even though that defendant be insolvent and even though that judgment went unsatisfied, barred all actions." *Polidori,* 217 N.J.Super. 424, 429, 526

A.2d at 232; citing *Tino v. Stout,* 49 N.J. 289, 296, n. 2, 229 A.2d 793 (1967).

**26.** Joint tortfeasors are defined as: "two or more persons jointly or severally liable in tort for the same injury to person or property, whether or not judgment has been recovered against all or some of them." N.J.S.A. 2A:53A–1.

feasor.); *Polidori*, 217 N.J.Super. at 432, 526 A.2d at 234 (refusing to construe "judgment" as including settlement which had been memorialized in a stipulation of dismissal).

However, New Jersey does recognize an exception to the above rule. A settlement "elevated to the status of a judgment by formal court proceeding, and which discharges the injured party's claim against a non-settling tortfeasor" may form the basis for a contribution action under the Act. *Polidori*, 526 A.2d at 234; *Young v. Steinberg*, 53 N.J. 252, 255, 250 A.2d 13, 14 (1969); *Tefft v. Tefft*, 192 N.J.Super. 561, 565, 471 A.2d 790, 792–793 (App.Div.1983). Thus, under New Jersey law, a right to contribution based upon a consent decree which does not extinguish the injured party's claims against a joint tortfeasor does not exist. *See Also:* Restatement (Second) of Torts § 886A(2) ("The right of contribution exists only in favor of a tortfeasor who has discharged the *entire claim* for the harm by paying more than his equitable share of the common liability ..."); Uniform Contribution Among Tortfeasor Act § 1(d), 12 U.L.A. 63 (1975) ("A tortfeasor who enters into a settlement with a claimant is not entitled to recover contribution from another tortfeasor whose liability for the injury or wrongful death is *not extinguished* by the settlement ...") (emphasis added).

Instantly, Witco argues that the Consent Decree between Elf Atochem and the United States does not meet the *Young* exception, because it did not discharge the United States' right to sue other parties. To be sure, Sections XVI(R) (6–10) and XII(A) of the Decree state the following:

6. Nothing contained in this Consent Decree shall affect the right of EPA to pursue an action against any entity, other than the Settling Defendant, pursuant to § 107(a) of CERCLA, 42 U.S.C. § 9607(a), for recovery of any costs incurred by EPA relating to this Consent Decree and/or for any other response costs which have been incurred or will be incurred by the United States or EPA relating to the Site, which are not reimbursed to the United States or EPA.

7. Nothing contained in this Consent Decree shall affect the right of EPA to enter into any Consent Decree, to issue any Consent Order or to issue any other orders unilaterally to any responsible party for the Site pursuant to CERCLA, or to require the performance on any additional response actions which EPA determines are necessary for the Site.

8. Nothing contained in this Consent Decree shall act as a bar to, a release of, a satisfaction of, or a waiver of any claim or cause of action which EPA or the United States has at present or which EPA or the United States may have in the future against any person or entity, including Settling Defendant, on anything which is not a Covered Matter under Section XVII of this Consent Decree and which relates to the Site.

9. Nothing contained in this Consent Decree shall be construed to mean that the Settling Defendant is the only potentially responsible party with respect to the release and the threatened release of Hazardous Substances at the Site.

10. Nothing contained in this Consent Decree shall affect any right, claim, interest, defense or cause of action of EPA, the United States or the Settling Defendant with respect to any entity which is not a party to this Consent Decree. Nothing in this Consent Decree constitutes a decision by EPA on pre-authorization or on any approval of funds under Section 111(a)(2) of CERCLA, 42 U.S.C. § 9611(a)(2).

. . . . .

## XXI

### *EFFECT OF SETTLEMENT/CONTRIBUTION PROTECTION*

A. Nothing in this Consent Decree shall be construed to create any rights in, or grant any cause of action to, any person not a Party to this Consent Decree. The preceding sentence shall not be construed to waive or nullify any rights that any person not a signatory to this Consent Decree may have under applicable law. Each of the Parties expressly reserves any and all rights (including, but not limited to,

498

any right to contribution), defenses, claims, demands and causes of action which each Party may have with respect to any matter, transaction or occurrence relating in any way to the Site against any person not a Party hereto.

In light of this language then, we can reach no other conclusion but that the Consent Decree between Atochem and the United States does not operate to extinguish the government's right to sue other parties or potentially responsible parties such as Witco. This Court therefore finds that Elf Atochem does not have a contribution claim under New Jersey law. Defendants' motion for summary judgment is therefore granted as to Counts IV, V and VI of Plaintiff's complaint. *See also: In re National Smelting of New Jersey, Inc.*, 722 F.Supp. 152, 177 (D.N.J.1989).

## V. CONCLUSION

Therefore, for the reasons explained above, Defendant Witco Corporation's Motion for Summary Judgment is denied, as to Count II (CERCLA) and Count III (New Jersey Spill Act) of Elf Atochem's complaint. Summary Judgment is granted as to Counts IV (negligence), V (strict liability), and VI (nuisance). An appropriate order follows.

## ORDER

AND NOW, this 1st day of September, 1993, upon consideration of the Motion for Summary Judgment of Defendant Witco Corporation as to Counts II–VI of Plaintiff's Complaint, it is hereby ORDERED that the motion is GRANTED as to Counts IV, V and VI, and DENIED as to Counts II and III and judgment in no amount is entered in favor of Witco Corporation and against Plaintiff as to Counts IV, V and VI of Plaintiff's Complaint.